ERNEST GALVAN – 196065
KARA J. JANSSEN – 274762
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:        egalvan@rbgg.com
              kjanssen@rbgg.com

JAEHYUN OH
NY Bar No. 5668512
THE JACOB D. FUCHSBERG LAW FIRM, LLP
3 Park Avenue, 37th Floor
New York, New York 10016
Telephone:    (212) 869-3500, Ext. 245
Email:        J.Oh@Fuchsberg.com

*Pro hac vice* application to be submitted
forthwith

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| T.G. and S.R.V., individuals,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, RAY J. GARCIA, an individual, and JOHN/JANE DOES 1 through 10,<br><br>Defendants. | Case No.:  4:23-cv-06285<br><br>**COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

Plaintiffs T.G. and S.R.V., by and through their attorneys, The Jacob D. Fuchsberg Law Firm, LLP and Rosen Bien Galvan & Grunfeld LLP, for their Complaint against Defendants as above captioned, allege as follows upon information and belief:

## INTRODUCTION

1.    Ray J. Garcia (hereinafter "Defendant Garcia" or "Garcia"), a former Warden of the Federal Correctional Institution, Dublin (hereinafter "FCI Dublin"), exploited his position and power to stalk, sexually harass, assault, and sexually abuse at least 10 individuals who were incarcerated at FCI Dublin in the custody of the United States Bureau of Prisons (hereinafter "BOP") while he was employed there. In recent years, FCI Dublin, a federal female low-security prison with an adjacent satellite camp, has become the center of legislative inquiries, criminal investigations, and public attention with respect to the issue of staff sexual abuse in BOP custody—in part because of Defendant Garcia's involvement in sexual abuse as he rose through the ranks at FCI Dublin, as an Associate Warden and then the Warden, while he preyed upon vulnerable prisoners.[1]

2.    While incarcerated at FCI Dublin in 2020 and/or 2021, Plaintiffs T.G. and S.R.V. were each sexually harassed, abused, and assaulted by Defendant Garcia on repeat occasions while he was acting within the course and scope of his employment. Plaintiffs each suffered their sexual abuse in silence, lest they were retaliated against or deprived of the modest privileges they had as incarcerated individuals. Defendant Garcia exercised complete dominion and power over the Plaintiffs as the Warden of the facility, with the acquiescence of other BOP officers who were acting within the course and scope of their employment.

3.    Defendant Garcia's abuse only came to an end when he was removed from FCI Dublin in July 2021 amid criminal investigation. In September 2021, Defendant Garcia was criminally charged for sexually abusing an incarcerated person including by

---

[1] *See, e.g.*, S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 1 (Dec. 13, 2022), https://www.hsgac.senate. gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Report%20-%20 Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf.

COMPLAINT
DEMAND FOR JURY TRIAL
Case No.: 4:23-cv-06285

digitally penetrating her vagina. *See United States v. Garcia*, No. 4:21-cr-00429-YGR (N.D. Cal.). Through a superseding indictment, Defendant Garcia was later charged for sexually abusing two additional women and for making false statements to a federal agent as well. Garcia's criminal case culminated in a jury trial, and the jury found him guilty beyond a reasonable doubt on all counts on December 8, 2022. Through extensive testimony and evidence produced at trial, including naked photos of victims found on his government-issued cell phone, Defendant Garcia was shown to have used FCI Dublin as his playground, systematically grooming, manipulating, and preying upon powerless victims.

4.      In addition to the three charged victims, the Government identified seven additional victims whose accounts regarding Garcia's sexual abuse were deemed reliable. The Government identified three of these additional victims as trial witnesses and identified five of them in the Government's sentencing memorandum, indicating that these victim's sexual abuse followed the same pattern as that of the charged victims. Both T.G. and S.R.V. were named in the Government's sentencing memorandum, with their written victim impact statements referenced therein.

5.      At the sentencing hearing held on March 22, 2023, Defendant Garcia admitted to having had sexual contacts with persons in his custody to gratify his sexual desires, while in the performance of his official duties as an employee of BOP and Warden of FCI Dublin. He was sentenced to 70 months in prison and 15 years of supervised release.

6.      During his sentencing, Defendant Garcia, as well as the Judge and the US Attorney on the case, remarked on how Garcia's actions also set the tone for the rest of FCI Dublin. Seven individuals who worked under Defendant Garcia have now been charged with sexual abuse of incarcerated people. *See United States v. Highhouse*, No. 4:22-cr-00016-HSG (N.D. Cal.) (sentenced to 84 months in prison following guilty plea); *United States v. Klinger*, No. 4:22-cr-00031-YGR (N.D. Cal.) (awaiting sentencing following guilty plea); *United States v. Bellhouse*, No. 4:22-cr-00066-YGR (N.D. Cal.)

(awaiting sentencing following jury trial where he was found guilty on all counts); *United States v. Chavez*, No. 4:22-cr-00104-YGR (N.D. Cal.) (sentenced to 20 months in prison following guilty plea); *United States v. Smith*, No. 4:23-cr-00110-YGR (indicted on 12 counts); *United States v. Jones*, No. 4:23-cr-00212-YGR (N.D. Cal.) (awaiting sentencing following guilty plea); *United States v. Nunley*, No. 4:23-cr-00213-YGR (N.D. Cal.) (awaiting sentencing following guilty plea).

7.      Other than these eight known perpetrators, there are at least 14 additional BOP employees or contractors who have been placed under investigation for sexual misconduct that occurred at FCI Dublin. Under Garcia's leadership, FCI Dublin became a cesspool of sexual abuse.

8.      Defendant Garcia's recurrent sexual abuse of incarcerated persons was obvious to various agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, associate wardens, and investigators at FCI Dublin during relevant times. Defendant Garcia created and maintained a pervasive culture of sexual misconduct and retaliation at FCI Dublin during his tenure as Associate Warden from around December 2018 through around November 2020, which became further pronounced when he became the Warden in or around November 2020. Up to Defendant Garcia's removal from FCI Dublin in July 2021, BOP personnel deliberately ignored alarming warning signs and sex abuse allegations against Garcia.

9.      It was apparent to Plaintiffs and other victims incarcerated at FCI Dublin that BOP personnel would not intervene to prevent Defendant Garcia's sexual assaults, let alone adequately discipline, supervise, or reprimand him in accordance with BOP's purported zero-tolerance policy against suspected staff sex abuse on prisoners. Upon information and belief, as early as the beginning of 2019, BOP employees were aware that Garcia was making daily rounds in housing units and spending time alone with female prisoners. This highly abnormal behavior continued unchecked throughout Garcia's reign at FCI Dublin.

10.     Garcia openly told other BOP officers that he would conduct rounds and interact with incarcerated persons by himself, contrary to the existing protocols. There was no intervention to correct this. Garcia also instructed other BOP officers to maintain blind spots within FCI Dublin that were not captured by security cameras, contrary to the existing protocols. BOP personnel who were tasked with monitoring security cameras knew that Garcia often interacted with incarcerated persons in these blind spots and stayed there for lengthy periods of time for no apparent reason. There was no intervention to correct this. Garcia would also bring contrabands, condoms, and a cell phone into FCI Dublin, and use them as part of his *modus operandi* in sexual abuse. There was no intervention to correct this. Garcia frequently flaunted his connections with the BOP administrators including those in the Central office in Washington D.C. and with Stephen Putnam, then-Special Investigative Services (hereinafter "SIS") Lieutenant at FCI Dublin, telling his victims that he would not be fired even if his sexual misconduct is discovered.

11.     Suspicions and allegations of Garcia's sexual abuse abounded at FCI Dublin by the end of 2020, as many BOP employees saw, knew of, and disregarded Garcia's suspicious interactions with incarcerated persons, some of which amounted to flagrant violations of FCI Dublin's security or operating protocols. Nevertheless, Defendant Garcia was appointed as the Warden of FCI Dublin in or around November 2020. With the willful ignorance and tacit approval of his colleagues, Defendant Garcia continued his predatory reign on FCI Dublin, leaving countless victims in his wake including the Plaintiffs.

12.     It was only through the deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel, as well as abject systemic failures at FCI Dublin and BOP, that Defendant Garcia's sexual abuse could continue until July 2021. BOP personnel's reckless disregard of the safety and welfare of victims including Plaintiffs is highlighted by the fact that multiple correctional officers were sexually assaulting women incarcerated at FCI Dublin throughout the relevant times, resulting in its well-deserved reputation as the "rape club." Defendant Garcia fed into, and was also encouraged and enabled by, this toxic culture of FCI Dublin.

13.     As a result, Plaintiffs T.G. and S.R.V. were each forced to engage in recurrent sexual encounters with Defendant Garcia by threats of force or coercion.

14.     Defendant Garcia sexually assaulted, abused, and harassed T.G. from approximately January 2021 through August 2021, including by digitally penetrating T.G.'s vagina and having T.G. masturbate him. As a transgender transitioning from female to male, T.G. has female genitalia but identifies as a man and is not sexually interested in other men.[2] In or around December 2020, Garcia approached T.G. by making inappropriate sexual comments, questioning T.G.'s sexuality, asking if he is a virgin, and telling him that he needs to have sex with a man. Garcia proceeded to order T.G. to come to the "rec barn," a building that people typically used for recreation but tended to be unoccupied during COVID-19 pandemic. On two occasions between January and April 2021, Garcia ordered T.G. to meet him on the second floor of the rec barn. Each time, Garcia made T.G. pull his pants down and forcibly put his fingers inside of T.G.'s vagina. Each time, Garcia also pulled his own pants down, grabbed T.G.'s hand, and forced T.G. to stroke his penis for several minutes. Garcia also provided T.G. with drugs as a way of forcing T.G. to stay silent regarding the sexual abuse. Because of these drugs, T.G. was eventually placed in Special Housing Unit (hereinafter "SHU") for 90 days, purportedly under investigation by SIS Lieutenant Putnam. Garcia kept coming to T.G.'s cell in the SHU, threatening T.G. not to report him. Around the time that Garcia was removed from FCI Dublin in July 2021, T.G. was released from SHU and transferred to a different BOP facility.

15.     From approximately December 2020 through April 2021, Defendant Garcia also sexually assaulted S.R.V., including by forcing her to give him oral sex. When S.R.V. was written up for a disciplinary infraction in December 2020, Garcia manipulated S.R.V. by imposing an excessive punishment upon her known as an encumbrance for 120 days. This meant that S.R.V.'s account was completely frozen, and therefore, she could not

---

[2] T.G. uses male pronouns and thus is identified throughout this Complaint as such.

purchase even basic supplies such as laundry detergent or stamps. When Garcia came to the housing unit for his daily rounds, he made sexual comments to S.R.V. and told her that things could be arranged so that she could get out of the encumbrance early if she would spend time with him in the orderly's closet. Garcia knew that S.R.V. was a trash orderly for her housing unit, and hence had easy access to the closet. On two occasions between January and April 2021, Garcia ordered S.R.V. to come to the orderly's closet. Each time, Garcia took his penis out, fondled S.R.V.'s breasts and vagina, and forced S.R.V. to give him oral sex. Garcia also held S.R.V.'s neck and head forcefully as he ejaculated in her mouth. After the assaults, Garcia threatened S.R.V. multiple times that he will put her in the SHU if she reports him.

16.     T.G. and S.R.V. (hereinafter collectively "Plaintiffs") experienced catastrophic and unnecessary pain and suffering because of Defendants' egregious disregard for, and carelessness towards, Plaintiffs' safety and well-being despite myriad warning signs regarding Garcia's abhorrent conduct.

17.     Plaintiffs bring this suit pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and its progeny, for violations of their respective rights under the Fifth and Eighth Amendments to the United States Constitution by cruel and unusual treatment inflicted upon them by Defendant Garcia. Plaintiffs further bring this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*, in connection with the deficient supervision and custodial care provided to them by various BOP personnel including Garcia, within the scope of their employment with the BOP. Plaintiffs also bring claims based upon California state law on gender violence and sexual assault.

18.     Plaintiffs seek redress for Defendants' unlawful conduct, which caused them to suffer permanent and catastrophic injuries.

## JURISDICTION AND VENUE

19.     This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b) as arising under the Constitution, laws, and/or treaties of

the United States of America. Plaintiffs' claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing actions seeking relief against the United States. Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) with respect to any state law claims, as they are related to and form part of the same case or controversy as claims based on the federal Constitution, laws, and/or treaties.

20.    This Court has personal jurisdiction over the Defendants because the alleged incidents occurred within the confines of the State of California.

21.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402(b) as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within the boundaries of this District, in the County of Alameda.

### CONDITIONS PRECEDENT TO THIS LAWSUIT

22.    Plaintiffs have properly complied with the requirements of 28 U.S.C. § 2675 by presenting Administrative Claims against the United States of America. Both Claims were timely filed with the BOP on September 7, 2022, within two years of the accrual of the causes of action.

23.    BOP acknowledged receipt of these Administrative Claims in letters dated September 12, 2022, but has failed to dispose these Claims to date. Under 28 U.S.C. § 2675(a), BOP's failure "to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim." By the filing of this action, Plaintiffs elect to deem BOP's lack of response as the final denial of Plaintiffs' Administrative Claims in their entirety. Therefore, Plaintiffs exhausted requisite administrative remedies.

### PARTIES

24.    At all times relevant hereto, Plaintiff T.G. was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at 5701 8th St, Dublin, CA 94568, commonly known as FCI Dublin. Through the Government's motion for a reduced sentence, T.G. was released from BOP custody as of September 2023 and currently resides in the State of North Carolina.

25.     At all times relevant hereto, Plaintiff S.R.V. was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at 5701 8th St, Dublin, CA 94568, commonly known as FCI Dublin. Through the Government's motion for a reduced sentence, S.R.V. was released from BOP custody as of September 2023 and currently resides in the State of North Carolina.

26.     As victims of sexual assault as defined by 28 C.F.R. Part 115.6, Plaintiffs respectfully seek to use their initials instead of their actual names to protect their privacy while proceeding with this civil lawsuit. Plaintiffs are entitled to protect their identity in this public court filing by not disclosing their full names, given the extremely sensitive and graphic nature of their allegations. Plaintiffs will need to divulge matters that are highly sensitive and of a personal nature, and revealing their names would pose a risk of retaliatory harm to the Plaintiffs or unwarranted intrusion of their privacy.

27.     Defendant United States of America (hereinafter "United States") is the appropriate defendant for Plaintiffs' claims under the Federal Tort Claims Act. The United States is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

28.     At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all BOP matters including at FCI Dublin and was responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including but not limited to Defendants Ray J. Garcia and John/Jane Does 1 through 10.

29.     In addition, at all relevant times, United States was responsible for enforcing the rules of the BOP, and for ensuring that BOP personnel obey the Constitution and laws of the United States.

30.     At all times relevant hereto, Defendant United States, acting through the BOP, hired Defendants Ray J. Garcia and John/Jane Does 1 through 10 to serve as

1  "correctional officers" and "law enforcement officers" within the meaning and powers of

2  28 U.S.C. § 2680(h).

3      31.    At all times relevant hereto, Defendant Ray J. Garcia was the Warden,

4  Associate Warden, Correctional Officer, and/or an employee of BOP and Defendant

5  United States. In his capacity as an agent, servant, and employee of Defendant United

6  States, and within the course and scope of his employment as such, Defendant Garcia was

7  responsible for the day-to-day oversight, supervision, care, custody, control, direction,

8  safety, and well-being of people confined at FCI Dublin, including Plaintiffs. Defendant

9  Garcia is sued in his individual capacity.

10      32.    At all times relevant hereto, Defendants John/Jane Does 1 through 10

11  (hereinafter "Defendants Does 1-10"), whose actual names, identities, and capacities are

12  not known to Plaintiffs despite reasonable efforts to obtain such information, and who are

13  sued herein by the fictitious designation of "Does," were persons, entities, and/or

14  corporations in charge of the custodial care provided to Plaintiffs during relevant times.

15  Specifically, Defendants Does 1-10, acting within the scope of their capacity as agents,

16  servants, contractors, and employees of BOP and/or Defendant United States, either had

17  supervisory authority or the opportunity to observe and intervene with respect to

18  Defendant Garcia's sexual abuse at FCI Dublin. If and when the true names, identities, or

19  capacities of such fictitiously designated Defendants are ascertained, Plaintiffs will ask

20  leave of this Court to amend this Complaint to assert their true names, identities, and

21  capacities, together with the allegations pertaining to such Defendants.

22      33.    In performing the acts and/or omissions contained herein, Defendants, and

23  each of them, acted under color of federal law, and each acted maliciously, callously,

24  intentionally, recklessly, with gross negligence, and with deliberate indifference to the

25  rights and personal security of Plaintiffs. Each of them knew or should have known that

26  their conduct, attitudes, actions, and omissions were a threat to Plaintiffs and to their

27  constitutionally and statutorily protected rights. Despite this knowledge, Defendants failed

28  to take steps to protect Plaintiffs and to ensure that their rights were adequately protected

9

while in the custody of Defendants.

34.     At all times relevant hereto, each Defendant was the agent, representative, or employee of each other Defendant. At all times relevant hereto, each Defendant was acting within the course and scope of said alternative agency, representation, or employment and was within the scope of their authority, whether actual or apparent. At all times relevant hereto, each Defendant was the authorized agent, partner, servant, or contractor of each other Defendant, and the acts and omissions herein alleged were done by them acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of each other Defendant. Accordingly, each of them is jointly and severally liable to Plaintiffs.

## JURY DEMAND

35.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues and claims in this action that are so triable, including but not limited to their *Bivens* and state law claims.

## STATEMENT OF FACTS

## INDICATIONS AND WARNING SIGNS OF GARCIA's SEXUAL ABUSE

36.     Since Defendant Garcia was first hired by Defendant United States as an Associate Warden in or around December 2018, the warning signs of his perversion were ample and obvious to any reasonable BOP personnel.

37.     For over two years, Defendant Garcia utilized similar methods to stalk, assault, abuse, and terrorize at least 10 different victims incarcerated at FCI Dublin. His routines and *modus operandi* involved flagrant violations of FCI Dublin's security and operating protocols, which were and should have been obvious to other BOP personnel.

38.     From January 2019 onward, certain correctional officers and/or counselors and/or unit managers including but not limited to Stephanie Millikin observed Defendant Garcia making rounds at the housing units daily. This was highly unusual for an Associate Warden and could not be explained by a legitimate purpose.

39.     From January 2019 onward, certain correctional officers and/or counselors

and/or unit managers including but not limited to Stephanie Millikin observed Defendant
Garcia spending substantial amounts of time with incarcerated women by himself.
Typically, even on the rare occasions when the executive staff make rounds, they are
accompanied by other staff members as a matter of policy.

40.    When other officers asked to accompany Defendant Garcia during his
interactions with incarcerated people, Defendant Garcia rejected these requests and
continued to spend time with victims by himself.

41.    From January 2019 onward, certain correctional officers and/or counselors
and/or unit managers including but not limited to Stephanie Millikin observed Defendant
Garcia stopping by certain people's jail cells every time he came to the housing units and
spending significant amounts of time talking to those people. Defendant Garcia was also
observed escorting these people to various isolated areas within FCI Dublin, which were
typically "blind spots" that are not captured by security cameras. Again, there was no
legitimate explanation as to why he frequently accompanied incarcerated people to these
blind spots by himself.

42.    Defendant Garcia oversaw supervision and monitoring throughout FCI
Dublin, and within that capacity, he knew to identify various blind spots that fell outside of
the view of the security cameras. Defendant Garcia repeatedly took advantage of these
known "blind spots" to brutally abuse his victims, including by forcefully digitally
penetrating their vaginas, forcing them to touch his penis, forcing them to perform oral
sex, fondling their breasts and buttocks, ordering them to remove their clothes, and making
them see sexual photos of himself. Other BOP officers knew of, and disregarded, Garcia's
abnormal behavior where he repeatedly isolated himself with certain prisoners.

43.    Defendant Garcia's routine included coercing his victims into silence by
promising them certain benefits related to their conditions of confinement. While spending
inordinate amounts of time with certain prisoners, Defendant Garcia also abused his
authority and flaunted his power by providing them with certain benefits. For example,
Defendant Garcia told other BOP personnel to approve certain requests by his victims,

including requests for transfer, even when they were not justified. Other BOP personnel complied with Garcia's directions, either willingly or due to fear of negative employment repercussions. If BOP personnel had conducted needed investigations into the unjustified benefits that certain people had received from Garcia, they would have discovered Garcia's sexual abuse before he came to target the Plaintiffs.

44.    While rewarding his victims with certain benefits, Defendant Garcia also instituted extreme punitive measures as a way of torturing other prisoners and making them vulnerable to his sexual abuse. Garcia instituted a long-term encumbrance policy such as that described above for S.R.V. Garcia also created or maintained a policy where, when a person is sent to the SHU for disciplinary infraction or suspected infraction, her cellmate also must go to the SHU for no fault of her own. Garcia also allowed, condoned, or encouraged SIS Lieutenant Putnam to keep prisoners in the SHU for indeterminate periods of time under the guise of investigation—without due process such as a disciplinary hearing.

45.    Victims including the Plaintiffs were well aware of Garcia's reputation where he sent women to the SHU for filing complaints against staff and kept them there for many months. Prisoners lose access to the bare modicum of privileges they have, including access to phone, mail, and recreation time, while they are in the SHU. Garcia took advantage of the widespread fear of SHU to manipulate and intimidate his victims including the Plaintiffs.

46.    In 2019 and 2020, Defendant Garcia led staff training at FCI Dublin regarding the Prison Rape Elimination Act ("PREA"). Congress enacted the PREA in 2003, 34 U.S.C. §§ 30301, *et seq.* to establish national standards for preventing and responding to sexual abuse of federal prisoners. Pursuant to PREA, the U.S. Department of Justice promulgated certain regulations, which remain binding on all BOP facilities including FCI Dublin. *See* 28 C.F.R. § 115. Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance policy for sexual abuse and sexual harassment"; "the right of inmates to . . . be

free from retaliation for reporting sexual abuse and sexual harassment"; signs and dynamics of prison sexual abuse"; and "how to avoid inappropriate relationships with inmates." *Id.* § 115.31(a).

47.     Garcia was FCI Dublin's PREA compliance officer during the relevant times. Instead of directing FCI Dublin staff to comply with these mandates of PREA, Defendant Garcia demonstrated by his behavior that sexual abuse was acceptable. Many officers at FCI Dublin interpreted Garcia's behavior as *carte blanche* to do as they pleased. Sexual abuse, sexual assault, and sexual harassment ran rampant throughout the facility, and Garcia implied by his conduct that the perpetrators would not be punished. The message was clear, as a sexual predator administered the PREA training—that PREA did not actually exist at FCI Dublin.

48.     In or around March 2020, when FCI Dublin went into a lockdown in response to COVID-19 pandemic, Defendant Garcia's sexual abuse further escalated. Garcia could control the comings-and-goings of staff and prisoners throughout the facility to isolate, terrorize, and abuse his victims at his will. Upon information and belief, Garcia sometimes orchestrated or used lockdowns as a part of his scheme to isolate, assault, and abuse his victims. Garcia often made comments to the effect that he would never lift the lockdown as long as he was at FCI Dublin because, with it, he could move as he pleased.

49.     Defendant Garcia was regularly observed with contraband such as a cell phone. He would often walk around FCI Dublin with a phone in his pocket, with the camera facing outward, and there was widespread suspicion among staff and prisoners that he was filming, recording, or taking pictures of certain prisoners. This suspicion was later proven to be true when the criminal investigation into Garcia's work cell phone revealed a large volume of sexually graphic photographs including nude photos of incarcerated women. If BOP personnel had conducted prompt inquiry into Garcia's suspicious conduct, they would have discovered Garcia's sexual abuse before he came to target the Plaintiffs.

50.     As established through the criminal case, Defendant Garcia repeatedly sexually assaulted a victim from December 2019 through March 2020; sexually abused

another victim between March 2020 and September 2020; and sexually abused a third victim repeatedly between January 2021 and July 2021. Garcia also ordered at least three other women to strip naked or dance for him while he did his rounds on multiple occasions. Four other victims including the Plaintiffs reported Garcia's abuse to the Government, which was deemed reliable by the prosecutor. Garcia sexually abused each of these victims who were under his custodial, supervisory, and disciplinary authority for his sexual gratification.

51.     Given the overtness and frequency with which Defendant Garcia preyed on women who were under his custody, other BOP personnel suspected or should have suspected that Garcia was sexually abusing prisoners. Binding PREA regulations mandate staff reporting, where all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a). When an incarcerated person is subject to a substantial risk of imminent sexual abuse, BOP shall take immediate action to protect that person. *See* 28 C.F.R. § 115.62. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a). The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. *See id.* § 115.76(b). Victims shall also be offered medical and mental health care by the BOP. *See id.* § 115.83.

52.     Defendant United States and its agents, servants, contractors, and employees had numerous opportunities to follow the above-mentioned mandates and stop Defendant Garcia's misconduct. Defendant Garcia's action was abnormal, obvious, and suspicious for sexual misconduct. In addition, upon information and belief, correctional officers in the control room were charged with monitoring the security cameras and following up on any suspicious activities that they noticed on the cameras. These officers saw or should have

seen that Defendant Garcia frequently disappeared into unmonitored areas with prisoners who were not authorized to be in those areas alone with an officer. Nevertheless, BOP personnel took no actions to investigate or stop Garcia's suspicious and recurrent behavior.

53.     Defendant United States and its agents, servants, contractors, and employees failed to investigate, discipline, supervise, monitor, question, or stop Defendant Garcia despite numerous indications of misconduct. This was in direct violation of mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

## GARCIA's PROMOTION TO THE WARDEN

54.     Instead of being disciplined, Defendant Garcia was considered for promotion when the former warden was moved to another facility in or around October 2020. As of December 2020, Defendant United States offered Garcia the permanent position as the Warden of FCI Dublin. Through this promotion, the United States and its agents, servants, contractors, and employees condoned, permitted, acquiesced to, consented to, and tacitly approved Defendant Garcia's longstanding abuse of prisoners.

55.     Agents, servants, contractors, and employees of BOP, including at least some of the unit managers, counselors, correctional officers, lieutenants, associate wardens, and investigators at FCI Dublin during relevant times, were aware of suspicions, indications, or concerns regarding Defendant Garcia's sexual misconduct. They were aware of Defendant Garcia's frequent protocol violations and unexplained suspicious interactions with certain prisoners. Nonetheless, they refused to take the required action to report, monitor, supervise, or investigate Garcia and allowed him to reign the entire facility as the Warden.

56.     It is extraordinary and inexplicable that the United States continued to allow Defendant Garcia to spend alone time with female prisoners in isolation, creating daily opportunities for him to commit additional sexual assaults.

57.     The fact that Defendant Garcia could get away with sexual abuse while flagrantly violating BOP's policies led his victims including the Plaintiffs to believe that Garcia was untouchable. The victims had legitimate concerns that they would suffer

retaliation or other substantial harm if they were to report Defendant Garcia's predatory behavior. To further fuel this fear, Defendant Garcia verbally threatened his victims to ensure their silence. He also told his victims that he is close to the higher-up's within the BOP as well as to Lieutenant Putnam, and therefore, any allegations regarding his sexual misconduct will not be taken seriously.

58.     As the Warden, Defendant Garcia became responsible for the safekeeping, care, protection, discipline, programming, and release of prisoners incarcerated at FCI Dublin. Garcia was also responsible for the hiring, retention, training, supervision, management, discipline, and conduct of FCI Dublin's staff, and for determining its operating procedures and policies. The Warden has power to investigate staff, send prisoners to SHU, transfer prisoners, conduct searches, revoke video or phone call privileges, approve or deny compassionate release, or encumber or otherwise discipline prisoners. Simply put, Defendant Garcia was given unchecked dominion and power.

59.     Defendant Garcia was still required to follow overarching policies and procedures that are binding upon BOP. He was not allowed to maintain inappropriate relationships with prisoners, favor certain prisoners, or give preferential treatment to certain prisoners. Defendant Garcia continued to violate these policies and procedures, as well as PREA mandates, thereby normalizing the rampant sexual abuse at FCI Dublin. As the Inspector General stated following Garcia's criminal trial, he "created a heinous culture that failed to protect female inmates from widespread sexual abuse and violence at the hands of other Dublin employees."[3]

60.     Other employees at FCI Dublin knew about Defendant Garcia's repeated sexual assaults of female prisoners and failed to report him or to take other steps to stop it. Throughout Garcia's tenure as the Warden, FCI Dublin's personnel failed to follow PREA mandates and continued to turn a blind eye towards other officers' sexual misconduct,

---

[3] U.S. Attorney's Office, *Press Release, Former Federal Prison Warden Sentenced to More Than Five Years In Prison For Sexual Abuse of Three Female Inmates* (Mar. 22, 2023), https://www.justice.gov/usao-ndca/pr/former-federal-prison-warden-sentenced-more-five-years-prison-sexual-abuse-three.

1  thereby enabling sexual assaults to occur throughout the facility routinely and

2  continuously.

3                    **HISTORY OF SEXUAL ABUSE AT FCI DUBLIN**

4        61.    Astonishingly, sexual abuse by Defendant Garcia and other officers working

5  under him is just the latest incidence of a long and sordid history of recurring sexual abuse

6  at FCI Dublin.

7        62.    There have been other publicized incidents of female prisoners at FCI Dublin

8  being sexually abused by male BOP employees. In 1996, three women were brought to a

9  male housing unit at an adjacent facility where BOP officers opened their cell doors,

10  allowing male prisoners to rape them. In the 1990's and 2000's, at least four BOP

11  employees were convicted of sexual abuse of female prisoners at FCI Dublin.[4] In the

12  2010's, a dozen BOP employees were removed from FCI Dublin for sexually abusing

13  prisoners, although none of them were arrested.[5]

14        63.    In 2019, a victim reported to FCI Dublin staff, the Federal Bureau of

15  Investigations (hereinafter "FBI"), and the U.S. Attorney's Office that she had been raped

16  by then-Chaplain of FCI Dublin, James Highhouse. While Highhouse initially denied the

17  allegations and continued to work at FCI Dublin, the woman's courage eventually led to a

18  criminal indictment being filed against Highhouse in 2022. Through the criminal case and

19  the ultimate guilty plea, it was revealed that Highhouse had sexually abused at least six

20  women between 2014 and 2019.

21        64.    Highhouse's case prompted a broader criminal investigation, which

22  eventually led to a wave of criminal charges being filed against a total of eight former FCI

23  Dublin employees including Defendant Garcia. As described above, seven out of eight

24

25  [4] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF
FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022),

26  https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-
13%20PSI%20Staff%20Report%20-

27  %20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf.

28  [5] *Id.*

charged officers have been convicted of, or pled guilty to, sexually abusing prisoners, while one officer awaits trial. In each case, including Garcia's, there were additional victims who suffered sexual abuse by the same officer, who were acknowledged as part of the court records but not included as part of official criminal charges.

65.     Sexual abuse of incarcerated people is an issue endemic to BOP, beyond FCI Dublin as well. In 2022, the U.S. Senate Permanent Subcommittee on Investigations issued a report (hereinafter "the PSI Report), which found that over the past decade, BOP employees sexually abused female prisoners in at least two-thirds (19 out of 29 facilities) of federal prisons that have held women. The PSI Report found that Defendant United States' management failures enabled continued sexual abuse of incarcerated people by BOP personnel. The PSI Report specifically found that the United States, through BOP, "failed to detect, prevent, and respond to sexual abuse of female prisoners in its custody."[6]

66.     Despite this established history of sexual abuse in BOP custody and at FCI Dublin specifically, Defendant United States failed to institute a reliable way of detecting and stopping sexual abuse of incarcerated people. As a telling example, FCI Dublin's PREA audit report that was published on March 12, 2022, claimed that FCI Dublin was compliant with all PREA standards. Even though this audit report was published after Garcia's sexual abuse became public through criminal investigation, sexual misconduct by Garcia, as well as by other officers who were working under Garcia during the period relevant to the audit, cannot be found anywhere in the report. This blatant deficiency of the audit reflects the culture of Defendant United States and of BOP, of turning a blind eye to prison staff sexual abuse of incarcerated people.

67.     Based on the history of sexual abuse at FCI Dublin, Defendants had actual notice and knowledge that correctional officers could abuse their position of power to assault prisoners, including in off-camera areas.

68.     Nevertheless, Defendants failed to take adequate steps to prevent Defendant

---

[6] *Id.* at 4.

Garcia from engaging in recurrent sexual abuse, including by installing additional security cameras to eliminate the blind spots. This was in direct violation of mandatory and non-discretionary BOP policies, which required that BOP staff eliminate any known blind spots and install sufficient video monitoring to prevent sexual abuse.

69.    Defendant United States and its agents, servants, contractors, and employees failed to remedy the culture of staff sexual abuse at FCI Dublin before, during, and after Defendant Garcia's sexual assaults of the Plaintiffs.

**GARCIA's SEXUAL ABUSE OF PLAINTIFFS**

70.    Emboldened by other BOP personnel's failure to stop him, and their apparent willingness to empower him further through a promotion, Defendant Garcia continued his sadistic reign over FCI Dublin population. After he became the Warden in or around November 2020, Defendant Garcia's unchecked predatory behavior predictably increased in scope and frequency. With increasing boldness, Garcia continued to use the tools available to him through the BOP, such as lockdowns, blind spots from cameras, and a government-issued cell phone, to violate and terrorize his victims including Plaintiffs T.G. and S.R.V.

71.    S.R.V. first arrived at FCI Dublin in or around 2018 at 26 years of age and remained incarcerated there until around April 2022.

72.    T.G. first arrived at FCI Dublin in or around January 2019 at 34 years of age and remained incarcerated there until around August 2021. T.G. is a transgender and identifies himself as a man, but he had not undergone sex re-assignment surgery and therefore had female genitalia.

73.    During these times, Plaintiffs were under the custodial care, supervision, and control of the agents, servants, employees, and independent contractors of Defendant United States and/or BOP, including Defendant Garcia and other officers at FCI Dublin whose identities are not presently known. As a matter of both Federal and state law, Defendants had an absolute non-delegable duty to see that prisoners in their custody receive adequate custodial care and supervision; to maintain the safety, health, and well-

being of the prisoner population; and to prevent prisoners such as the Plaintiffs from being subjected to undue harm and/or cruel and unusual punishment. Defendants abjectly failed to carry out these duties.

74.     Both T.G. and S.R.V. recall that their interactions with Defendant Garcia became more frequent and noticeable after COVID-19 lockdown started in or around March 2020. They saw Garcia making daily rounds through their housing units, looking in the jail cells, and speaking to incarcerated women. Garcia frequently walked around with his phone in his pocket, with the camera facing outward, and the Plaintiffs learned that he had a reputation for taking photographs of certain women while they worked out.

75.     Both T.G. and S.R.V. had been incarcerated in BOP custody for years when they became incarcerated at FCI Dublin, and therefore, they immediately noticed that Garcia's conduct was suspicious and abnormal compared to what they had seen from Associate Wardens or Wardens of other BOP facilities.

76.     By 2020, it was a common understanding among FCI Dublin's prisoners as well as staff that Garcia's behavior was protected and condoned by other BOP personnel. Plaintiffs would notice other BOP employees questioning why Garcia was always doing rounds at the housing units and spending time with incarcerated women, but nothing was done to stop him. Plaintiffs heard that Garcia had a reputation for having sexual relations with other prisoners.

77.     Upon information and belief, Defendant Garcia became bolder in his sexually abusive behavior when COVID-19 pandemic began, and the compound was put on lockdown. This meant that Garcia and other officers could control the comings-and-goings throughout the facility, without worrying that they will be seen by other incarcerated women. During the lockdown, incarcerated women had to be accompanied by correctional officers to enter or leave a building, and the officers could control the movement so that only one officer and one woman would be left alone in a building. In addition, many buildings were empty during the lockdown. For example, the "rec barn building," which was typically used for indoor recreational activities such as yoga, would

1   remain empty as any recreational activities would occur outdoors during the pandemic.

2        78.     When Defendant Garcia became the Warden in or around November 2020,

3   Plaintiffs noticed a significant increase in sexually abusive behavior throughout FCI

4   Dublin. Correctional officers frequently treated incarcerated women like a piece of meat,

5   and Plaintiffs would overhear correctional officers evaluating women's bodies and having

6   inappropriate interactions with incarcerated women. Defendant Garcia, through his own

7   conduct, demonstrated to the rest of the BOP personnel that such behavior was acceptable

8   and even encouraged. For example, many women had to spend most of their time in their

9   jail cells during the COVID-19 lockdown, and Garcia would make daily rounds throughout

10  the housing units having overtly inappropriate interaction and conversation with the

11  women. Yet, no BOP personnel intervened to stop this behavior.

12       79.     As Defendant Garcia's sexually abusive behavior became increasingly overt,

13  incarcerated women attempted to report or show Garcia's "creepy" or perverted behavior

14  to certain unit managers, counselors, and/or correctional officers including Stephanie

15  Millikin, Tess Korth, and Denzil Shirley. These officers violated their mandatory

16  obligations under applicable BOP protocols as well as regulations including 28 CFR

17  § 115.61, wherein all staff members must immediately report "any knowledge, suspicion,

18  or information regarding an incident of sexual abuse or sexual harassment that occurred in

19  a facility." In the alternative, if these officers in fact reported their suspicion or knowledge

20  pursuant to the regulations, the administrators who received the report failed to take

21  appropriate action to immediately investigate and sanction Garcia for his conduct.

22       80.     T.G. recalls Defendant Garcia initially approaching him some time in 2020,

23  asking seemingly benign questions such as how much prison time he had left, what he was

24  incarcerated for, and what his job assignment was at FCI Dublin. During relevant times,

25  T.G. worked for Facilities at FCI Dublin, doing an electrician apprenticeship.

26       81.     Upon information and belief, Defendant Garcia took a sexual interest in T.G.

27  when he learned that he identified herself as a man. After he became the Warden in or

28  around November 2020, Garcia began to meet T.G. after breakfast, taking T.G. on walks

on his way to work in the Facilities department. Garcia began to ask sexually explicit questions such as whether T.G. had ever had sex with a man before. When T.G. revealed that he had not, Garcia asked if he could see if T.G. was really a virgin. T.G. felt extremely uncomfortable and was surprised that other BOP personnel who saw their interaction did not intervene.

82.     Then one day in or around January 2021, during one of the walks from breakfast to T.G.'s work, Garcia told T.G. to meet him at the rec barn during recreation time (which was around 8 a.m.)—specifically upstairs as no one was allowed to go there during the pandemic. Even though T.G. initially resisted, he felt that he had to comply as Garcia was the man of power.

83.     When T.G. went to "upstairs rec," he saw Defendant Garcia waiting for him. Garcia told him to pull his pants down. Garcia then put his fingers inside of T.G.'s vagina, which began to bleed. Garcia pulled down his own pants as well, completely exposing his penis. Garcia also grabbed T.G.'s hand, put it on his penis, and forced him to stroke his penis up and down with his hand on top of T.G.'s hand.

84.     Throughout the sexual assault, Garcia kept looking at his phone. When T.G. asked whether he was filming, Garcia said no. T.G. suspected that Garcia was receiving alerts or notification from another BOP officer, who was serving as Garcia's lookout to ensure that no one would interrupt him.

85.     T.G. felt extremely uncomfortable during the sexual assault and did not feel pleasure at all. During the incident, Garcia also made demeaning remarks about T.G.'s gender identity, including that he had a fetish for women that looked like a man and that it felt like T.G. was a virgin.

86.     At some point, Defendant Garcia took T.G.'s hand off his penis. T.G. left the rec barn before Garcia did.

87.     Upon information and belief, there were at least two BOP personnel stationed in or around the rec barn, who saw Defendant Garcia and/or T.G. entering the building. There was an African American female officer, whose last name upon

information and belief was Turner, who was the recreation officer stationed on the first floor of the rec barn. Ms. Turner would notice Garcia spending an excessive amount of time around the rec barn, talking and working out with incarcerated women. Ms. Turner would comment on how strange it was that the Warden would so frequently spend recreational time with incarcerated women, but she did not take steps to stop or report Garcia's behavior. In addition, Officer Nicholas Ramos was at the captain's office or control room, which was right next to the rec barn. Upon information and belief, Officer Ramos saw T.G. going into the rec barn building, which was suspicious and abnormal, and yet he did not stop T.G. Upon information and belief, Officer Ramos had a reputation for being complicit with Garcia's sexual abuse and serving as his lookout, especially as Ramos was often charged with monitoring the security cameras throughout FCI Dublin in the control room. Officer Ramos later died by suicide in or around August 2022, while on administrative leave from FCI Dublin and under investigation for sexually abusing incarcerated women himself.

88.    Defendant United States and its agents, servants, contractors, and employees had actual and constructive notice that the rec barn, as an off-camera area, could be used as a site of sexual abuse. There was at least one woman who previously reported to SIS as well as FBI about having had sexual encounters with a correctional officer in the rec barn at FCI Dublin, on multiple occasions between around 2014 and 2018. Even though this report was made in or around 2019, Defendant United States failed to install security cameras in the rec barn including the upstairs rec. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States towards the risk of sexual abuse that incarcerated women face.

89.    Consistent with his *modus operandi*, Defendant Garcia took advantage of his institutional power, knowledge, and resources to isolate T.G. in an off-camera area without interruption. Incarcerated people are not allowed to be alone in an off-camera area with an officer. Therefore, the BOP officer who was monitoring the security cameras was, and should have been, suspicious of Defendant Garcia spending time alone with T.G. in the rec

barn. During relevant times, several correctional officers, including Officer Ramos, Officer Sergio Saucedo, and a male officer whose last name was upon information and belief Lagade (or Lagode), were monitoring the security cameras. Nevertheless, no BOP personnel came to investigate, intervene, or inquire as to the sexual assault.

90.    Shortly after the sexual assault, Defendant Garcia brought drugs to T.G. as a method of silencing him as well as demanding more sexual favors from him. Consistent with his *modus operandi*, Defendant Garcia used his power and unchecked access to contraband as a tool for sexual abuse. Garcia continued to approach T.G., asking for sexual demands.

91.    About two weeks after the first sexual assault, in or around February 2021, Defendant Garcia again approached T.G. as she was coming out of the dining hall after breakfast on his way to work and ordered T.G. to meet him at upstairs rec. T.G. felt that he had no choice but to comply.

92.    When T.G. arrived at the upstairs rec, he again found Garcia waiting for him. Garcia again ordered T.G. to take his pants down, penetrated T.G.'s vagina with his fingers, put T.G.'s hand on his penis, and made T.G. stroke his penis. Garcia had a condom on and had his phone out again.

93.    T.G. felt that Garcia knew that he did not feel attracted to men and sexually assaulted him as a way of taunting him and flaunting his power and control over him. T.G. felt disgusted with himself and had nightmares about the sexual assaults. He did his best to avoid Garcia after the second sexual assault by walking in a large group whenever he saw Garcia approaching him. Even though he enjoyed the electrician apprenticeship greatly, T.G. also quit his job with the Facilities department so that he would not be cornered by Garcia on his way to work. As a result, T.G. lost the hours he had built up towards completing the apprenticeship.

94.    In or around April 2021, T.G. was sent to the SHU for investigation into drugs within FCI Dublin. There was no official incident report that was served on T.G., and no disciplinary hearing where he could be heard. Instead, SIS Lieutenant Putnam came

to ask T.G. where the drugs had come from. When T.G. explained that Garcia had given it to him, Putnam dismissed T.G. and accused him of lying. T.G. remained in the SHU for 90 days, until July 2021 when Defendant Garcia was removed from FCI Dublin under investigation. Throughout these 90 days, T.G. was not even afforded the minimal benefits that SHU detainees are typically allowed, such as an hour a day of recreational time. Pursuant to the punitive disciplinary measures under Garcia's regime, T.G.'s cellmate was also sent to the SHU for no reason other than that T.G. was under investigation, jeopardizing the friendship they had.

95.     Even though T.G. is not personally aware of how much involvement Defendant Garcia personally had in his SHU placement, what is clear is that Garcia used it as an opportunity to frighten and terrorize T.G. into silence. Every time he would come around to the SHU, Garcia took the opportunity to harass and threaten T.G. to "keep your mouth shut" and "not to say anything."

96.     Garcia's ability to come around and threaten him as he pleased further scared and traumatized T.G. Even though other SHU officers as well as SIS Lieutenant Putnam knew or should have known about Garcia's inappropriate interactions with T.G., they did not do anything to stop Garcia from continually harassing and threatening him.

97.     T.G. was released from the SHU in or around July 2021, after which he was immediately transferred to a different BOP facility. Even though he did not interact with Garcia any longer, T.G. remained deeply affected by the sexual assaults, feeling ashamed and questioning his sexuality. In 2022, T.G. reported Garcia's sexual abuse to the FBI and the Department of Justice Office of Inspector General (hereinafter "OIG").

98.     Upon information and belief, other FCI Dublin staff, including without limitation, Officers Turner, Ramos, Millikin, Korth, Shirley, Saucedo, Lagade, and Lieutenant Putnam, knew or should have known about Defendant Garcia's sexually abusive conduct towards T.G., and yet did nothing to prevent him from going on to repeatedly assault S.R.V. as well.

99.     S.R.V. started to interact with Defendant Garcia in or around December 2020

when she was caught with unauthorized medication and received a disciplinary write-up, commonly known as a "shot." When women misbehaved, Garcia would not only send them to the SHU but also place them on a lengthy encumbrance, depriving them of all their property, commissary money, and contact with the loved ones. After serving the SHU time for about three weeks, S.R.V. was placed on a 120-day encumbrance, which meant that her account was completely frozen with no way of purchasing any commodities; that she was only allowed to make one 5-minute phone call per week; and that her personal contacts were all deleted.

100.   Defendant Garcia began to stop by S.R.V.'s jail cell during his daily rounds through the housing unit, making inappropriate sexual comments and complimenting her appearance. He would tell her that she was beautiful, that she had beautiful lips, and that he would love to feel her lips. One time around January 2021, Garcia also asked S.R.V. whether he could take a photograph of her bent down, cleaning her jail cell floor on her hands and knees. Even though S.R.V. refused, saying that he would get her in trouble, Garcia continued to pay special attention to S.R.V.

101.   In or around February 2021, about two months into her encumbrance, S.R.V. asked Officer Millikin, who was upon information and belief her unit manager at the time, that she really needed to obtain certain necessary items such as laundry detergent, feminine care products, and stamps. Officer Millikin refused to help and told S.R.V. to speak to Garcia. Thereafter, when Garcia came for his daily round to her jail cell, S.R.V. pleaded with him to help her. Garcia told S.R.V. that "things could be arranged" and they could "work something out" to get her out of encumbrance early, and that he knew "places we can go to get together," meaning to have sexual encounter. Garcia's intention was obvious as he stared at S.R.V.'s breasts as he made this comment.

102.   S.R.V. tried to resist this proposition. However, Defendant Garcia continued to come around for his daily rounds, demanding sexual favors. Like T.G., S.R.V. felt that she could not refuse Garcia and that she would suffer adverse consequences if she continued to resist. So, one day in or around March 2021, about two weeks after Garcia's

1  initial proposition to "get together," when Garcia came to her cell for the daily round and

2  asked her if she was "ready," she relented.

3      103.   At this point, S.R.V. was working as a trash orderly in her housing unit.

4  Defendant Garcia knew this.

5      104.   Garcia told S.R.V. to meet him after his round in the orderly's closet, located

6  on the first floor in the Admission & Orientation hallway that connects the E and F

7  housing units. Consistent with his *modus operandi*, Garcia used his institutional

8  knowledge to choose this location, which could be easily accessed by S.R.V. as a trash

9  orderly and where there was no security camera inside.

10     105.   When S.R.V. braced herself and entered the orderly's closet, Garcia was

11  already inside waiting for her. S.R.V. saw that he was already touching his penis through

12  his pants to get himself erect. He complimented S.R.V.'s body and touched her breast and

13  vagina with his hands, over her clothes. He also had her touch his body. He then took out

14  his penis and made her give him oral sex. He was very rough with her, pushing her head

15  down hard and ejaculating in her mouth.

16     106.   Afterward, Garcia ordered S.R.V. to go out first, check the hallway, and tell

17  him whether there was anyone outside. S.R.V. told him that the hallway was clear and left

18  first.

19     107.   Defendant United States and its agents, servants, contractors, and employees

20  had actual and constructive notice that the orderly's closet, as an off-camera area, could be

21  used as a site of sexual abuse. There was a widespread rumor within FCI Dublin that at

22  least one other woman had been sexually assaulted by a correctional officer inside the

23  orderly's closet.

24     108.   Incarcerated people are not allowed to be alone in an off-camera area with an

25  officer. Therefore, the BOP officer who was monitoring the security cameras was, and

26  should have been, suspicious of Defendant Garcia spending a significant amount of time

27  alone with S.R.V. inside the orderly's closet. Nevertheless, no BOP personnel came to

28  investigate, intervene, or inquire as to the sexual assault.

109.    About a week after the first sexual assault, when Defendant Garcia was doing his daily round through the unit, S.R.V. asked whether he would remove her encumbrance. She showed him the encumbrance paperwork that had to be signed by him. Garcia said yes, but that he wanted to "feel [her] again." Garcia sexually harassed her, giving her compliments and telling her that "the first time was good."

110.    About a week later, Garcia again told S.R.V. that he would go wait for her in the orderly's closet when he finishes his round through the unit. S.R.V. felt that she had no choice but to comply and to go to the orderly's closet again, where Garcia sexually assaulted her for a second time.

111.    When S.R.V. entered the orderly's closet, Garcia was already there. He groped her through her clothes, putting his hands on her neck, breasts, and vagina in a hasty and aggressive manner. Garcia held his penis through the zipper in his pants, making her give him oral sex. Garcia grabbed S.R.V.'s neck and pushed her down hard while ejaculating in her mouth, making her feel that she was unable to breathe. S.R.V. felt that her back was against the wall and that she could not escape him.

112.    S.R.V. felt extreme guilt and shame afterward and questioned what her family, including her daughter, would think of her. She did her best to avoid Defendant Garcia as much as possible after this second sexual assault. Garcia still verbally harassed her on about 10 additional occasions, complimenting her body, telling her that he wanted to feel her again, and telling her to keep the sexual assaults a secret. He used his power and authority to his advantage, telling S.R.V. things like "You know not to ever mention anything. You know that I have a lot of people on my side." S.R.V. had no choice as an incarcerated woman but to tell Garcia "Of course, sir. I know."

113.    Defendant Garcia repeatedly told S.R.V. that he would find out and send her to the SHU, if she told any BOP staff about what happened. S.R.V. realized that her complaints about sexual abuse would not be taken seriously and would just be shared with her abuser. S.R.V. also knew that if Garcia was upset, he could have another officer tear up her cell and destroy or confiscate all her property. She knew that for example, Officer

Ramos had a reputation for doing so at Garcia's order.

114.   Defendant Garcia also kept using the encumbrance against her, threatening her not to tell anyone about the sexual assaults if she wanted to ever get off the encumbrance. S.R.V. ended up completing the full 120 days of her encumbrance until around April 2021.

115.   Defendant Garcia's conduct made S.R.V. feel that she was not good enough and that she was worthless. She felt that she was an object, not a person, at FCI Dublin. The sexual abuse affected S.R.V.'s self-esteem in devastating ways, causing her to isolate herself from other people and to harbor suicidal ideation. Even after Garcia was removed from FCI Dublin, S.R.V. continued to feel suicidal, paranoid, and anxious.

116.   When the Task Force from the Central Office of BOP came to FCI Dublin to investigate sexual abuse at the facility in or around March 2022, S.R.V. shared that she had felt extremely uncomfortable with Defendant Garcia and requested a program transfer. She was transferred to a different BOP facility in or around April 2022. After the transfer, S.R.V. reported Garcia's sexual abuse to the FBI and OIG.

117.   Upon information and belief, other FCI Dublin staff, including without limitation, Officers Turner, Ramos, Millikin, Korth, Shirley, Saucedo, Lagade, and Lieutenant Putnam, knew or should have known about Defendant Garcia's sexually abusive conduct towards S.R.V., and yet did nothing to stop his assaults.

118.   In summary, Defendant Garcia had unlimited, unmonitored access to prisoners including Plaintiffs, which allowed him to sexually abuse each of them on numerous occasions between 2020 and 2021. There were many missed opportunities for other BOP personnel to notice and stop Defendant Garcia's crime. Despite being aware of Garcia's suspicious behavior, officers refused to take any action, allowing him to act with impunity.

119.   BOP personnel violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident

of sexual abuse or sexual harassment that occurred in a facility."

120.    In violation of mandatory BOP policies and federal regulations, Defendant United States' agents, servants, contractors, and employees at FCI Dublin took no steps to keep the Plaintiffs safe from Defendant Garcia, even though they were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to people under Garcia's purported custodial, supervisory, and disciplinary care.

121.    By allowing Defendant Garcia to repeatedly assault prisoners at FCI Dublin, Defendant United States' agents, servants, contractors, and employees assumed and/or acquiesced in the risk of injuring additional victims such as the Plaintiffs, demonstrating a plain disregard of an excessive risk to Plaintiffs' safety and welfare.

122.    Defendant United States' agents, servants, contractors, and employees knew or should have known of the substantial problems and shortcomings at FCI Dublin: in the training that staff receive regarding sexual abuse; the glaring lack of security cameras in certain locations of the facility; the system for reporting sexual abuse complaints; the treatment of victims who reported sexual abuse; the oversight of the sexual abuse prevention program, including by Defendant Garcia; the actual violations of BOP security and operating protocols by Garcia; and his propensity in engaging in sexually inappropriate and abusive behavior.

123.    The repeated horrors that Defendant Garcia inflicted on the Plaintiffs occurred only as a direct result of the negligence, gross negligence, carelessness, recklessness, and deliberate indifference of numerous BOP officials.

**AFTERMATH OF DEFENDANT GARCIA's SEXUAL ABUSE**

124.    Defendant Garcia's crime only came to an end when he was removed from FCI Dublin on or around July 22, 2021. Around this time, Garcia was interviewed by an FBI agent, where he initially denied ever demanding sexual favors from incarcerated people.

125.    Defendant Garcia was initially charged with two counts of sexual abuse on September 24, 2021. A federal grand jury issued a superseding indictment on August 23,

2022, charging Garcia with three counts of sexual abuse and four counts of abusive sexual contact. The superseding indictment also charged Garcia with one count of making false statements to a government agency during the investigation of the criminal acts. On December 8, 2022, a jury convicted Garcia of all counts. In March 2023, Garcia was sentenced to 70 months in prison, followed by 15 years' supervised release.

126.    To borrow from Deputy Attorney General Lisa Monaco's words, Defendant Garcia "abused his authority as a warden and violated his oath to protect those in the custody of the Bureau of Prisons[.] … [T]he Department of Justice will not waver in holding accountable BOP employees and executives who abuse their authority — whether they be a guard, chaplain or warden — and in pursuing justice for their victims." Department of Justice Inspector General Michael E. Horowitz also said, "Garcia used his position as warden to sexually abuse three inmates over multiple years, intimidated inmates and lied to cover up his crimes, and created a heinous culture that failed to protect female inmates from widespread sexual abuse and violence at the hands of other Dublin employees."

127.    The Department of Justice, through OIG, interviewed several of Defendant Garcia's victims, including T.G. and S.R.V. as part of the criminal proceedings. Unfortunately, Plaintiffs' fear regarding potential retaliation was borne true. For example, after they retained counsel, they were suddenly denied the right for legal calls that they previously had. BOP also failed to provide proper counseling or psychological treatment to Plaintiffs, even after they were notified about their sexual abuse.

128.    Each Plaintiff continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life.

129.    The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiffs' health and safety, Defendants' disregard of the excessive risk of harm to Plaintiffs' health and safety, and/or Defendants' negligent failure

to promptly protect Plaintiffs from foreseeable assaults by Defendant Garcia. Plaintiffs also suffer from other permanent injuries and deficits that will be established through expert consultation in this litigation.

130.    Upon information and belief, Plaintiffs will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiffs' injuries and damages are permanent and will continue to severely impact their health, welfare, and daily functioning. To the extent that they suffered sexual victimization prior to incarceration, Plaintiffs' psychological trauma and the resulting impairment were exacerbated because of Defendant Garcia's sexual assaults.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(*Bivens* Claim for Cruel and Unusual Punishment under the Eighth Amendment)**

**(Against Defendants Garcia and Does 1-10, in their respective individual capacities)**

131.    Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

132.    At all relevant times, Defendants were acting under color of law, *to wit*, under color of Constitution, statutes, ordinances, laws, rules, regulations, policies, customs, and usages of the United States. Defendants used their color of authority and position of power with Defendant United States to accost, coerce, manipulate, threaten, harass, sexually abuse, assault, intimidate, and retaliate against the Plaintiffs.

133.    The Eighth Amendment to the Constitution of the United States prohibits the infliction of "cruel and unusual punishments" on those arrested and awaiting trial or those convicted of crimes, including punishments that "involve the unnecessary and wanton infliction of pain."

134.    Prison staff sexual abuse of incarcerated people constitutes a form of torture that violates the Eighth Amendment. *See Bearchild v. Cobban*, 947 F.3d 1130, 1144 (9th Cir. 2020). Such abusive sexual contact also violates federal criminal law. *See, e.g.*, 18

U.S.C. §§ 2243, 2244.

135.   18 U.S.C. § 2243(b) makes it a felony for a BOP employee to "knowingly engage[] in a sexual act with another person who is (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging." Consent is not a defense to this crime, considering the inherently unequal power dynamic between BOP employees and prisoners. As the OIG explained in a 2005 report regarding prison staff sexual abuse, prisoners are precluded from having the same ability as staff members to consent to a sexual relationship. Simply put, there is no scenario under which an incarcerated person can give consent to sexual contact, harassment, or abuse by BOP personnel.

136.   Defendants have deprived Plaintiffs of their Constitutional rights under the color of federal law and are thus liable to Plaintiffs pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and its progeny including *Carlson v. Green*, 446 U.S. 14 (1980) and *Farmer v. Brennan*, 511 U.S. 825 (1994).

137.   Defendants subjected Plaintiffs to cruel and unusual punishment as defined by the Eighth Amendment when they sexually abused, assaulted, and harassed the Plaintiffs and provided or withheld certain privileges in order to coerce sexual favors or silence regarding sexual abuse from the Plaintiffs.

138.   Defendant Garcia intentionally and repeatedly sexually abused Plaintiffs, in reckless and callous disregard of Plaintiffs' clearly established rights to be free from cruel and unusual punishment, as guaranteed under the Fifth and Eighth Amendments to the United States Constitution.

139.   Defendant Garcia's sexual abuse of Plaintiffs was severe and repetitive, and caused Plaintiffs physical pain and emotional trauma. His assaults on Plaintiffs served no legitimate penological purpose.

140.   Defendant Garcia's sexual abuse of Plaintiffs was perpetrated with the subjective intent to gratify Garcia's sexual desire and to humiliate Plaintiffs.

141.   The abuse occurred under coercive circumstances, and by intentionally subjecting Plaintiffs to these acts, Defendants acted maliciously, in a manner that is deeply offensive to human dignity and void of penological justification.

142.   Defendant Garcia was aware of the criminal and wrongful nature of his conduct and yet refused to stop or rectify his behavior. He acted with deliberate and/or reckless disregard of the risk that Plaintiffs' constitutional and civil rights would be violated.

143.   Additionally, Defendants' conduct and omissions also deprived Plaintiffs of their clearly established rights under the Fifth and Eighth Amendments to the United States Constitution to be free from cruel and unusual punishment, in that they refused to acknowledge or respond to Defendant Garcia's history of sexual abuse and denied adequate protection to people incarcerated at FCI Dublin, although they knew or should have known that doing so posed an excessive and irreversible risk to Plaintiffs' safety and welfare.

144.   Defendants contributed to, and took advantage of, FCI Dublin's culture, turning a blind eye towards sexual harassment, abuse, and assaults of incarcerated people from Defendant Garcia down to correctional officers. Defendants knew, and ensured, that there would be no consequences for sexually abusive conduct at FCI Dublin.

145.   Defendants deliberately disregarded numerous warning signs, indications, and complaints regarding Defendant Garcia's sexually abusive behavior. They refused to take reasonable measures to provide Plaintiffs with a reasonably safe environment, and instead allowed Garcia to roam free in FCI Dublin without any restraints or supervision.

146.   Defendants knew or should have known that there was a high degree of risk that prisoners, and Plaintiffs in particular, would be sexually assaulted. Nonetheless, Defendants assisted in creating and increasing the danger to Plaintiffs by enabling, permitting, condoning, tolerating, and failing to prevent Defendant Garcia's recurrent sexual abuse. They enabled and acquiesced in Garcia's conduct, thereby placing Plaintiffs directly in harm's way.

COMPLAINT
DEMAND FOR JURY TRIAL

147. Moreover, Defendants did not properly penalize, discipline, or train Defendant Garcia to ensure that he would not continue to pose danger to the Plaintiffs. Garcia operated with impunity in an environment in which he knew he would not be adequately supervised, trained, or disciplined.

148. Each of the Defendants deprived Plaintiffs of their right to be free from cruel and unusual punishment by subjecting them to a substantial risk of serious harm including sexual abuse, by acting in conscious disregard of that known risk.

149. Each of the Defendants affirmatively used his or her authority in a way that created a danger to Plaintiffs or that rendered Plaintiffs more vulnerable to danger.

150. Each of the Defendants acted with a degree of culpability that shocks the contemporary conscience.

151. Each of the Defendants knew of and disregarded the excessive risk of harm to Plaintiffs' health and safety.

152. Each of the Defendants was aware of facts from which the inference could reasonably be drawn that Defendants had an opportunity to intervene and prevent the exacerbation of Plaintiffs' injuries and damages, and yet did not do so and instead inflicted unnecessary pain and suffering.

153. Such actions of each Defendant caused to subject the Plaintiffs in the custody or under the physical control of the United States government to cruel, inhuman, or degrading treatment or punishment prohibited by the Fifth and Eighth Amendments to the Constitution of the United States and constitute a blatant violation of Plaintiffs' civil rights secured by laws of the United States.

154. As a direct and proximate result of the foregoing, Plaintiffs T.G. and S.R.V. each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including but not limited to

1  any past and future medical expenses and economic injuries.

2    155.    As a direct and proximate result of Defendants' conduct, each Plaintiff has

3  suffered serious harm including, without limitation, physical, psychological, emotional,

4  mental, financial, and reputational harm, and therefore, each Plaintiff is entitled to recover

5  damages in an amount to be determined at trial.

6    156.    Plaintiffs also demand the imposition of exemplary and punitive damages as

7  to this Cause of Action, as the Defendants' conduct was malicious, willful, wanton,

8  callous, and reckless.

9    157.    Defendant Garcia's horrific abuse constitutes willful or malicious violation

10  of Plaintiffs' constitutional, statutory, and civil rights, which justifies an award of

11  exemplary and punitive damages.

12    158.    Defendants' deliberate indifference in their refusal to provide necessarily

13  protection to vulnerable prisoners including Plaintiffs and/or their direct refusal to

14  intervene once they observed or were notified about Defendant Garcia's sexual abuse

15  constitutes willful or malicious violation of Plaintiffs' constitutional, statutory, and civil

16  rights, which justifies an award of exemplary and punitive damages.

17    159.    The egregious circumstances surrounding the treatment of Plaintiffs at

18  relevant times, which caused them to suffer the injuries and damages as set forth above,

19  justify an award of exemplary and punitive damages.

20    160.    Therefore, in addition to compensatory damages, Plaintiffs seek an award of

21  exemplary and punitive damages, reasonable attorneys' fees, and costs against Defendants

22  as for this Claim.

23    WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

24  ### **SECOND CLAIM FOR RELIEF**

25  **(*Bivens* Claim for Violation of Due Process Rights under the Fifth Amendment)**

26  **(Against Defendants Garcia and Does 1-10, in their respective individual capacities)**

27    161.    Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the

28  foregoing paragraphs with the same force and effect as if fully set forth herein.

162.    At all relevant times, Defendants were acting under color of law, *to wit*, under color of Constitution, statutes, ordinances, laws, rules, regulations, policies, customs, and usages of the United States. Defendants used their color of authority and position of power with Defendant United States to accost, coerce, manipulate, threaten, harass, sexually abuse, assault, intimidate, and retaliate against the Plaintiffs.

163.    Defendants' conduct deprived Plaintiffs of their substantive due process rights protected under the Fifth Amendment to the United States Constitution, in that they failed and refused to provide Plaintiffs with proper custodial care and/or protection although they knew or should have known that doing so posed an excessive risk to Plaintiffs' safety and welfare. Defendants also provided or withheld certain privileges without due process, so as to coerce sexual favors or silence regarding sexual abuse from the Plaintiffs.

164.    Defendant Garcia intentionally and repeatedly sexually abused Plaintiffs, in reckless and callous disregard of Plaintiffs' clearly established rights to be free from cruel and unusual punishment, as guaranteed under the Fifth and Eighth Amendments to the United States Constitution.

165.    Defendant Garcia's sexual abuse of Plaintiffs was severe and repetitive, and caused Plaintiffs physical pain and emotional trauma. His assaults on Plaintiffs served no legitimate penological purpose.

166.    Defendant Garcia's sexual abuse of Plaintiffs was perpetrated with the subjective intent to gratify Garcia's sexual desire and to humiliate Plaintiffs.

167.    The abuse occurred under coercive circumstances, and by intentionally subjecting Plaintiffs to these acts, Defendants acted maliciously, in a manner that is deeply offensive to human dignity and void of penological justification.

168.    Defendant Garcia was aware of the criminal and wrongful nature of his conduct and yet refused to stop or rectify his behavior. He acted with deliberate and/or reckless disregard of the risk that Plaintiffs' constitutional and civil rights would be violated.

169.    Additionally, Defendants' conduct and omissions also deprived Plaintiffs of their clearly established rights under the Fifth and Eighth Amendments to the United States Constitution, in that they refused to acknowledge or respond to Defendant Garcia's history of sexual abuse and denied adequate protection to people incarcerated at FCI Dublin, although they knew or should have known that doing so posed an excessive and irreversible risk to Plaintiffs' safety and welfare.

170.    Defendants contributed to, and took advantage of, FCI Dublin's culture, turning a blind eye towards sexual harassment, abuse, and assaults of incarcerated people from Defendant Garcia down to correctional officers. Defendants knew, and ensured, that there would be no consequences for sexually abusive conduct at FCI Dublin.

171.    Defendants deliberately disregarded numerous warning signs, indications, and complaints regarding Defendant Garcia's sexually abusive behavior. They refused to take reasonable measures to provide Plaintiffs with a reasonably safe environment, and instead allowed Garcia to roam free in FCI Dublin without any restraints or supervision.

172.    Defendants knew or should have known that there was a high degree of risk that prisoners, and Plaintiffs in particular, would be sexually assaulted. Nonetheless, Defendants assisted in creating and increasing the danger to Plaintiffs by enabling, permitting, condoning, tolerating, and failing to prevent Defendant Garcia's recurrent sexual abuse. They enabled and acquiesced in Garcia's conduct, thereby placing Plaintiffs directly in harm's way.

173.    Moreover, Defendants did not properly penalize, discipline, or train Defendant Garcia to ensure that he would not continue to pose danger to the Plaintiffs. Garcia operated with impunity in an environment in which he knew he would not be adequately supervised, trained, or disciplined.

174.    Each of the Defendants deprived Plaintiffs of their right to be free from cruel and unusual punishment by subjecting them to a substantial risk of serious harm including sexual abuse, by acting in conscious disregard of that known risk.

175.    Each of the Defendants affirmatively used his or her authority in a way that

created a danger to Plaintiffs or that rendered Plaintiffs more vulnerable to danger.

176.    Each of the Defendants acted with a degree of culpability that shocks the contemporary conscience.

177.    Each of the Defendants knew of and disregarded the excessive risk of harm to Plaintiffs' health and safety.

178.    Each of the Defendants was aware of facts from which the inference could reasonably be drawn that Defendants had an opportunity to intervene and prevent the exacerbation of Plaintiffs' injuries and damages, and yet did not do so and instead inflicted unnecessary pain and suffering.

179.    Such actions of each Defendant caused to subject the Plaintiffs in the custody or under the physical control of the United States government to cruel, inhuman, or degrading treatment or punishment prohibited by the Fifth and Eighth Amendments to the Constitution of the United States and constitute a blatant violation of Plaintiffs' civil rights secured by laws of the United States.

180.    As a direct and proximate result of the foregoing, Plaintiffs T.G. and S.R.V. each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

181.    As a direct and proximate result of Defendants' conduct, each Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, each Plaintiff is entitled to recover damages in an amount to be determined at trial.

182.    Plaintiffs also demand the imposition of exemplary and punitive damages as to this Cause of Action, as the Defendants' conduct was malicious, willful, wanton, callous, and reckless.

183.  Defendant Garcia's horrific abuse constitutes willful or malicious violation of Plaintiffs' constitutional, statutory, and civil rights, which justifies an award of exemplary and punitive damages.

184.  Defendants' deliberate indifference in their refusal to provide necessarily protection to vulnerable prisoners including Plaintiffs and/or their direct refusal to intervene once they observed or were notified about Defendant Garcia's sexual abuse constitutes willful or malicious violation of Plaintiffs' constitutional, statutory, and civil rights, which justifies an award of exemplary and punitive damages.

185.  The egregious circumstances surrounding the treatment of Plaintiffs at relevant times, which caused them to suffer the injuries and damages as set forth above, justify an award of exemplary and punitive damages.

186.  Therefore, in addition to compensatory damages, Plaintiffs seek an award of exemplary and punitive damages, reasonable attorneys' fees, and costs against Defendants as for this Claim.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

## THIRD CLAIM FOR RELIEF

### (Negligence Claim under Federal Tort Claims Act)

### (Against Defendant United States)

187.  Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

188.  At all relevant times, Defendant United States, individually or through its agents, servants, contractors, and/or employees undertook and endeavored to, and did provide custodial care to people incarcerated at FCI Dublin including but not limited to the Plaintiffs.

189.  At all relevant times, Defendant United States hired various correctional and/or administrative personnel at FCI Dublin, including but not limited to wardens, associate wardens, captains, lieutenants, unit managers, counselors, correctional officers, and investigators.

190.    These FCI Dublin personnel were all federal employees and were acting within the scope of their employment with the United States when exercising custodial care, control, and supervision to Plaintiffs T.G. and S.R.V.

191.    At all relevant times, FCI Dublin personnel including Defendants Garcia and Does 1-10 held themselves out to persons incarcerated at FCI Dublin, and in particular to Plaintiffs, as correctional and/or administrative personnel with the knowledge, capacity, and ability to provide due care in accordance with standards of reasonable care common and acceptable in the community.

192.    Defendant United States, individually or through its agents, servants, contractors, and/or employees owed a non-delegable duty of care to Plaintiffs while they were housed at FCI Dublin.

193.    It was the Defendant's duty to ensure that correctional and/or administrative personnel with a history of assaults were not allowed to harm or injure other incarcerated people.

194.    It was the Defendant's duty to maintain, operate, and control FCI Dublin as a safe and secure space for persons in it, including but not limited to Plaintiffs.

195.    It was the Defendant's duty to provide adequate custody, control, supervision, and monitoring to persons at FCI Dublin, including but not limited to Plaintiffs.

196.    It was the Defendant's duty to adequately protect incarcerated people including Plaintiffs from foreseeable harm inflicted by BOP personnel known to be dangerous, including Defendant Garcia.

197.    Defendant United States, individually or through its agents, servants, contractors, and/or employees, acting within the scope of their office or employment, breached each of the foregoing duties that they owed to Plaintiffs by failing to take adequate steps to protect them from Defendant Garcia promptly despite the obvious risks presented by Garcia, a known predator in uniform.

198.    That breach directly exposed Plaintiffs to an unreasonable risk of bodily

injury, caused them to fear for their life and safety, and resulted in their being sexually assaulted on repeat occasions by Defendant Garcia.

199.    Agents, servants, contractors, and/or employees of the United States knew or should have known that Defendant Garcia was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Dublin.

200.    Agents, servants, contractors, and/or employees of the United States knew or should have known that Defendant Garcia had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations including his pattern of spending time in off-camera spaces alone with prisoners, the history of staff sexual abuse at FCI Dublin with similar *modus operandi* as that of Garcia, and/or prior reports or allegations made against Garcia.

201.    Agents, servants, contractors, and/or employees of the United States knew or should have known that Defendant Garcia was targeting Plaintiffs. They observed that Garcia was interacting and meeting with Plaintiffs in an unusual manner, such that they knew or should have known to report the behavior, investigate further and/or otherwise intervene to prevent any further sexual abuse, and yet they did not do so.

202.    Despite actual and constructive notice of Defendant Garcia's abuse, agents, servants, contractors, and/or employees of the United States failed to take reasonable steps to prevent Plaintiffs from being preyed upon by Garcia.

203.    Despite actual and constructive notice of Defendant Garcia's abuse, agents, servants, contractors, and/or employees of the United States did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiffs, and to ensure their safety, in violation of federal regulations and BOP protocols.

204.    Despite actual and constructive notice of Defendant Garcia's abuse, agents, servants, contractors, and/or employees of the United States acted negligently in training, retaining, supervising, and/or disciplining Garcia.

205.    Despite actual and constructive notice of Defendant Garcia's abuse, agents, servants, contractors, and/or employees of the United States failed to adequately monitor,

supervise, investigate, or discipline Garcia.

206.    Even though the United States' hiring, retention, and promotion of its employees are sometimes considered discretionary, when, as here, the United States was aware of its employees' tortious conduct, ignored and assisted in it, its retention of those employees does not represent a choice based on legitimate policy considerations.

207.    Agents, servants, contractors, and/or employees of the United States did not possess the necessary skill to maintain safe and secure environment and protect Plaintiffs from foreseeable harm.

208.    Agents, servants, contractors, and/or employees of the United States neglected to apply the skill they did have.

209.    Agents, servants, contractors, and/or employees of the United States did not use reasonable care in applying the skill they had.

210.    Agents, servants, contractors, and/or employees of the United States mistreated Plaintiffs and/or were negligent in other ways that are documented in the relevant records and/or in ways of which Plaintiffs are not yet aware.

211.    At all relevant times, each of the Defendants stood in such a relationship with the other Defendants as to make each of the Defendants liable for the acts and omissions of all other Defendants in regard to their treatment of Plaintiffs.

212.    Plaintiffs' injuries herein were proximately caused by the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its agents, servants, contractors, and/or employees, who were on duty and acting within the scope of their employment when they engaged in the wrongful conduct described herein.

213.    Plaintiffs' injuries were inflicted solely through the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its agents, servants, contractors, and/or employees, and through no fault or want of care or contributory negligence on the part of Plaintiffs.

214.    The failure of FCI Dublin personnel to prevent, investigate, or acknowledge

Defendant Garcia's sexual abuse served no legitimate policy purpose. On the contrary, FCI Dublin staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse. Their failure to do so was patently outside of their discretionary function.

215.    Plaintiffs' injuries were direct and proximate consequences of Defendant United States' (a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13; (c) decision to hire, retain, and promote BOP personnel who was suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory measures instead of providing proper support and protection, 28 C.F.R. § 115.43; (e) failure to report suspicion or allegation or sexual abuse, 28 C.F.R. § 115.61; (f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; and (g) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

216.    FCI Dublin personnel's employment at FCI Dublin was essential to their commission of tortious misconduct, which could not have occurred absent their federal employment and related privileges.

217.    FCI Dublin personnel's conduct was grossly negligent in that they were so careless as to show complete disregard for the rights and safety of Plaintiffs.

218.    FCI Dublin personnel were aware of facts that gave rise to an unreasonable risk that Plaintiffs would be irreparably injured.

219.    It was foreseeable to FCI Dublin personnel, based on the facts known to them, that Plaintiffs were at a risk of imminent serious harm including sexual abuse.

220.    Yet, FCI Dublin personnel failed and/or refused to prevent the abuse of Plaintiffs or to prevent its psychological consequences from worsening to the extent that they did.

221.    The above-described acts and omissions of FCI Dublin personnel constitute

the tort of negligence under the laws of the State of California.

222.    Under the Federal Tort Claims Act, Defendant United States of America is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

223.    As a direct and proximate result of the foregoing, Plaintiffs T.G. and S.R.V. each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

224.    As a direct and proximate result of Defendants' conduct, each Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, each Plaintiff is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

## FOURTH CLAIM FOR RELIEF

**(Negligent Infliction of Emotional Distress Claim under Federal Tort Claims Act)**

**(Against Defendant United States)**

225.    Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

226.    The above-described acts and omissions of FCI Dublin personnel including Defendants Garcia and Does 1-10 constituted extreme and outrageous conduct.

227.    Defendant United States, individually or through its agents, servants, contractors, and/or employees, directly caused, or disregarded a substantial probability of causing, severe emotional distress and mental injury to Plaintiffs.

228.    Plaintiffs in fact suffered debilitating emotional suffering.

229.    The above-described acts and omissions of FCI Dublin personnel constitute

the tort of negligent infliction of emotional distress under the laws of the State of California.

230. Under the FTCA, Defendant United States of America is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

231. As a direct and proximate result of the foregoing, Plaintiffs T.G. and S.R.V. each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

232. As a direct and proximate result of Defendants' conduct, each Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, each Plaintiff is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

## FIFTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress Claim under Federal Tort Claims Act)

### (Against Defendant United States)

233. Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

234. The acts and omissions of FCI Dublin personnel including Defendants Garcia and Does 1-10 constituted extreme and outrageous conduct.

235. Defendant United States, individually or through its agents, servants, contractors, and/or employees, engaged in extreme and outrageous conduct by repeatedly subjecting Plaintiffs to sexual acts while they were incarcerated in their custody. They abused their authority and power to violate them in a manner that is shocking, atrocious,

despicable, and intolerable beyond all bounds of decency.

236. Defendant United States, individually or through its agents, servants, contractors, and/or employees, had an intention to cause, or recklessly disregarded the probability of causing, severe emotional distress and mental injury to Plaintiffs.

237. Plaintiffs in fact suffered debilitating emotional suffering. Their emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

238. The above-described acts and omissions of FCI Dublin personnel constitute the tort of intentional infliction of emotional distress under the laws of the State of California.

239. Plaintiffs' injuries and damages were caused, in whole or in part, by intentional torts (*e.g.*, intentional infliction of emotional distress, gender violence, sexual assault, and battery) perpetrated by Defendants Garcia and Does 1-10. Under 28 U.S.C. §2680(h), Defendant United States is liable for intentional torts perpetrated by its agents, including correctional officers and other law enforcement officers, that occurred within the scope of their employment or under color of federal law as here.

240. At all relevant times, Defendants Garcia and Does 1-10 were acting under color of authority as "law enforcement officers" within the meaning of 28 U.S.C. §2680(h). At all relevant times, Defendants Garcia and Does 1-10 supervised, disciplined, oversaw, monitored, controlled, directed, ordered, restrained, and imprisoned the Plaintiffs within the scope and course of their employment with Defendant United States.

241. At all relevant times, Defendants Garcia and Does 1-10 used their authority as law enforcement officers to direct, order, restrain, force, overpower, intimidate, threaten, coerce, blackmail, harass, abuse, and assault the Plaintiffs and to prevent them from disclosing the sexual assaults for fear of retaliation, victim-blaming or shaming, additional assaults, among others.

242. At all relevant times, Defendants Garcia and Does 1-10 used their authority as law enforcement officers to sexually assault the Plaintiffs, knowing that they had no

1  ability to consent or to withhold consent.

2      243.   As a result of FCI Dublin personnel's use and abuse of their positions of

3  authority as "law enforcement officers" within the course and scope of their employment,

4  Defendant United States is vicariously liable for the intentional torts committed upon the

5  Plaintiffs. Therefore, Plaintiffs bring this claim under the FTCA for intentional infliction of

6  emotional distress against the United States, based on the conduct of its officers including

7  Defendants Garcia and Does 1-10.

8      244.   As a direct and proximate result of the foregoing, Plaintiffs T.G. and S.R.V.

9  each suffered debilitating psychological trauma, excruciating pain and suffering, emotional

10  distress, permanent and catastrophic psychological injuries, permanent physical ailments

11  associated with psychological injuries, humiliation, fear, depression, anxiety, frustration,

12  loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal

13  dignity, as well as attendant damages, both general and special, including but not limited to

14  any past and future medical expenses and economic injuries.

15      245.   As a direct and proximate result of Defendants' conduct, each Plaintiff has

16  suffered serious harm including, without limitation, physical, psychological, emotional,

17  mental, financial, and reputational harm, and therefore, each Plaintiff is entitled to recover

18  damages in an amount to be determined at trial.

19      WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

20  **SIXTH CLAIM FOR RELIEF**

21  **(Gender Violence Claim under Federal Tort Claims Act)**

22  **(Against Defendant United States)**

23      246.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the

24  foregoing paragraphs with the same force and effect as if fully set forth herein.

25      247.   Plaintiffs bring this claim under the FTCA for gender violence under

26  California Civil Code § 52.4 against the United States, based on the conduct of its officers

27  including Defendants Garcia and Does 1-10.

28      248.   Under California law, any person subjected to gender violence may bring a

1   civil action for damages against any responsible party.

2      249.    Gender violence is a form of sex discrimination that includes physical

3   intrusion or invasion of a sexual nature under coercive conditions. § 52.4 (c)(2).

4      250.    Gender violence is also committed when a defendant commits a criminal act

5   that has an element to it involving the use or threatened use of physical force against the

6   plaintiff. § 52.4 (c)(1). The statute does not require for there to be actual criminal charges,

7   complaints, or convictions.

8      251.    Here, Defendant Garcia discriminated against Plaintiffs based on their sex

9   and/or gender when he repeatedly sexually abused them, physically intruding and invading

10  upon their bodies under coercive conditions.

11     252.    Defendant Garcia also committed criminal conduct involving the use and

12  threatened use of physical force against the Plaintiffs.

13     253.    As a direct and proximate result of the foregoing, Plaintiffs T.G. and S.R.V.

14  each suffered debilitating psychological trauma, excruciating pain and suffering, emotional

15  distress, permanent and catastrophic psychological injuries, permanent physical ailments

16  associated with psychological injuries, humiliation, fear, depression, anxiety, frustration,

17  loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal

18  dignity, as well as attendant damages, both general and special, including but not limited to

19  any past and future medical expenses and economic injuries.

20     254.    As a direct and proximate result of Defendants' conduct, each Plaintiff has

21  suffered serious harm including, without limitation, physical, psychological, emotional,

22  mental, financial, and reputational harm, and therefore, each Plaintiff is entitled to recover

23  damages in an amount to be determined at trial.

24     WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

25                        **SEVENTH CLAIM FOR RELIEF**

26             **(Gender Violence Claim under California Civil Code § 52.4)**

27  **(Against Defendants Garcia and Does 1-10, in their respective individual capacities)**

28     255.    Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the

foregoing paragraphs with the same force and effect as if fully set forth herein.

256.    Plaintiffs bring this claim for gender violence under California Civil Code § 52.4 against Defendants Garcia and Does 1-10 in their individual capacities.

257.    Defendant Garcia intentionally sexually assaulted Plaintiffs and many other people incarcerated at FCI Dublin on numerous occasions. In subjecting Plaintiffs to Garcia's violence, Defendants Garcia and Does 1-10 acted with malice, oppression, and callousness, and their conduct constituted a reckless disregard of Plaintiffs' rights, which justifies an award of exemplary and punitive damages.

258.    Therefore, in addition to compensatory damages, Plaintiffs seek an award of exemplary and punitive damages, reasonable attorneys' fees, and costs against Defendants as for this Claim.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

## EIGHTH CLAIM FOR RELIEF

### (Sexual Assault and Battery Claim under Federal Tort Claims Act)

### (Against Defendant United States)

259.    Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

260.    Plaintiffs bring this claim under the FTCA for sexual assault and battery under California Civil Code § 1708.5 against the United States, based on the conduct of its officers including Defendants Garcia and Does 1-10.

261.    Under California law, sexual battery is defined as intentional harmful or offensive sexual contact with the plaintiff. A victim of sexual battery may bring a civil action for damages against the responsible party.

262.    Here, Defendant Garcia repeatedly subjected Plaintiffs to sexual acts, with the intent to cause harmful or offensive contact. Garcia's contact with the Plaintiffs was deeply offensive to their personal dignity and would offend a person of ordinary sensitivity.

263.    As a direct and proximate result of the foregoing, Plaintiffs T.G. and S.R.V.

each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

264.    As a direct and proximate result of Defendants' conduct, each Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, each Plaintiff is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

## NINTH CLAIM FOR RELIEF

**(Sexual Assault and Battery Claim under California Civil Code § 1708.5)**

**(Against Defendants Garcia and Does 1-10, in their respective individual capacities)**

265.    Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

266.    Plaintiffs bring this claim for sexual assault and battery under California Civil Code § 1708.5 against Defendants Garcia and Does 1-10 in their individual capacities.

267.    Defendant Garcia acted with the intent to cause harmful and offensive contact with Plaintiffs' intimate body parts, resulting in sexually offensive contact on numerous occasions with each Plaintiff as described above.

268.    Defendant Garcia acted with the intent to cause harmful and offensive contact with Plaintiffs by forcing them to have sexually offensive contact with his intimate body part on numerous occasions as described above.

269.    Defendant Garcia intentionally caused an imminent and reasonable apprehension of sexual assault and a sexually offensive contact with each Plaintiff directly and indirectly resulted on numerous occasions.

270.    In subjecting Plaintiffs to Garcia's sexual assault and battery, Defendants Garcia and Does 1-10 acted with malice, oppression, and callousness, and their conduct constituted a reckless disregard of Plaintiffs' rights, which justifies an award of exemplary and punitive damages.

271.    Therefore, in addition to compensatory damages, Plaintiffs seek an award of exemplary and punitive damages, and costs against Defendants as for this Claim.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

## TENTH CLAIM FOR RELIEF

### (Tom Bane Civil Rights Act Claim under Federal Tort Claims Act)

### (Against Defendant United States)

272.    Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

273.    Plaintiffs bring this claim under the FTCA for the violations of California Civil Code § 52.1, otherwise known as Tom Bane Civil Rights Act or "the Bane Act," against the United States, based on the conduct of its officers including Defendants Garcia and Does 1-10.

274.    The Bane Act provides remedy when plaintiffs' constitutional rights are interfered with by threat, coercion, or violence.

275.    Defendant United States, through its agents, servants, contractors, and/or employees, violated Plaintiffs' rights under the Bane Act by implementing threat, coercion, or violence to interfere with Plaintiffs' rights secured by not only federal constitution but California state constitution as well, including but not limited to their right of protection from bodily harm and sexual violation, imposition of punishment without due process, and cruel and unusual punishment. *See*, *e.g.*, Cal. Const. Art. I §§ 7, 17; Cal. Civ. Code § 43.

276.    Defendants Garcia and Does 1-10 intentionally, deliberately, and repeatedly interfered with Plaintiffs' constitutional rights by threats, intimidation, or coercion.

277.    Defendant United States is liable for the Bane Act violations of its agents, servants, contractors, and/or employee. *See Xue Lu v. Powell*, 621 F.3d 944, 950 (9th Cir.

1  2010).

2      278.    As a direct and proximate result of the foregoing, Plaintiffs T.G. and S.R.V.

3  each suffered debilitating psychological trauma, excruciating pain and suffering, emotional

4  distress, permanent and catastrophic psychological injuries, permanent physical ailments

5  associated with psychological injuries, humiliation, fear, depression, anxiety, frustration,

6  loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal

7  dignity, as well as attendant damages, both general and special, including but not limited to

8  any past and future medical expenses and economic injuries.

9      279.    As a direct and proximate result of Defendants' conduct, each Plaintiff has

10  suffered serious harm including, without limitation, physical, psychological, emotional,

11  mental, financial, and reputational harm, and therefore, each Plaintiff is entitled to recover

12  damages in an amount to be determined at trial.

13      WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

14  **PRAYER FOR RELIEF**

15      **WHEREFORE**, Plaintiffs T.G. and S.R.V. respectfully request that judgment be

16  entered against Defendants, and each of them, and that this Court grant the following to the

17  Plaintiffs:

18      1.    An award of compensatory damages for all injuries caused by the

19  Defendants, including psychological and personal injuries, pain and suffering, emotional

20  distress, humiliation, physical injuries, loss of enjoyment of life, loss of quality of life, and

21  mental, financial, economic, and reputational damages, both past and future, general and

22  special, and other harm, in an amount to be determined at trial;

23      2.    An award of exemplary and punitive damages against Defendants Garcia and

24  Does 1-10 as to the First, Second, Seventh, and Ninth Claims for Relief in an amount to be

25  determined at trial;

26      3.    An award of pre- and post-judgment interest to the fullest extent permitted

27  by law, for any and all monetary and/or non-monetary losses;

28      4.    An award of reasonable costs of suit and litigation expenses to the fullest

1 extent permitted by law;

2      5.      An award of reasonable attorneys' fees to the fullest extent permitted by law,

3 including but not limited to Cal. Civ. Code § 52.4; together with

4      6.      Such other and further relief at law or in equity as this Court may deem just

5 and proper.

6

7 DATED:  December 5, 2023          Respectfully submitted,

8                                              ROSEN BIEN GALVAN & GRUNFELD LLP

9

10                                             By:  /s/ Kara J. Janssen

11                                                  Kara J. Janssen

12                                             Attorneys for Plaintiffs

13 DATED:  December 5, 2023          THE JACOB D. FUCHSBERG

14                                              LAW FIRM, LLP

15

16                                             By:  /s/ Jaeyhun Oh

17                                                  Jaehyun Oh

18                                             Attorneys for Plaintiffs

19

20

21

22

23

24

25

26

27

28